UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **NO. 3:22-CR-117** |
| **v.** | ) | |
| | ) | **JUDGE VARLAN** |
| **WIGBERT BANDIE** | ) | |

## UNITED STATES' SENTENCING MEMORANDUM

Comes now, the United States of America, by and through the United States Attorney for the Eastern District of Tennessee, and files this sentencing memorandum. For the reasons set forth herein, the United States respectfully submits that a sentence at the high end of the advisory guidelines range would be sufficient but not greater than necessary to address the concerns set forth in Title 18, United States Code, Section 3553.

### I. Offense Conduct

**A. Background**

The scheme involving the defendant and his co-defendants primarily existed online through various social media platforms. Victims were generally contacted via social media by the defendant and others purporting to be various individuals living overseas, or members of the United States military deployed abroad. Under the guise of looking for a romantic relationship, the defendant and others contacted the victims to establish a relationship. Correspondence was only through social media, such as Facebook, and private messages. Once a rapport between the victim and the defendant was established, he informed the victim that he or she had inherited or located a large sum of gold but was financially unable to import the gold into the United States from the foreign location. Others involved in the conspiracy, using false or fictitious personas, asked the victims for money to help with the transport/import taxes or fees in exchange

for a large share of the gold once it arrived in the United States. The victims were often then instructed to send cash or checks or wire money to individuals, including the defendant, fake companies, or sometimes to "money mules" that were unwittingly part of the scam. The defendant and co-conspirators repeatedly asked the victims for money until either the victim ran out of money or became suspicious and ended the online relationship [Doc. 75, Presentence Report, ¶ 44].

**B. R.C., the Knoxville victim**

In 2019, a Knoxville resident, R.C., a widower in his sixties, maintained an online Facebook profile. In May 2019, the defendant, claiming to be "Kimberly Aaron McIntosh" initiated contact with him. "McIntosh" suggested moving the conversation to Google Hangouts for privacy, and then they began exchanging text messages R.C. Throughout this time, the defendant, as "McIntosh," e-mailed with R.C. using his Gmail account. Following numerous conversations via Facebook Messenger, Google Hangouts and, ultimately, text messages, "McIntosh" informed him of an opportunity to share in the inheritance of one hundred and eighty-nine (189) kilograms of gold located in Singapore. "McIntosh" promised a 40% return to R.C. for the investment of money [*Id*. at 45].

From about May 2019 to October 2019, under the direction of "McIntosh," R.C. sent funds to multiple entities by cash and wire from Knoxville, Tennessee, to co-defendant Khadijah Adams, in Linden, New Jersey, totaling $280,000. R.C. never received anything in return from "McIntosh" [*Id*. at 46].

The defendant, a Ghanian national residing in Ghana, having created the persona of "Kimberly McIntosh," furthered the scheme by "introducing" R.C. to "John Bothof," a purported liaison for Safety Shippers, a non-existent international shipping company [*Id*. at 47].

In addition to co-defendant Adams, the defendant also conspired with co-defendant Mubarak Braimah, also a Ghanian national residing in Ghana, the creator of "John Bothof," who

also used various methods to communicate with R.C., as "John Bothof." Through email and text messages, the defendant and co-defendant Braimah duped R.C. into paying fees to ship the gold inheritance from Singapore to the United States [*Id*. at 48].

Both the defendant and co-defendant Braimah sent R.C. a contract/Memorandum of Understanding, dated June 24, 2019, for the gold shipment. The contract/Memorandum of Understanding stated that "R.C. has agreed to lend 'Kimberly Aaron McIntosh' all the financial support in the shipment of the gold bars to the United States and complete previously discussed business." The contract/Memorandum of Understanding also stated that "40% of the gold bars will be given to R.C. as an exchange of the money invested in the shipment" [*Id*. at 49.]

The defendant and co-defendant Braimah worked in tandem with co-defendant Khadijah Adams. Co-defendant Adams, a naturalized United States citizen born in Ghana, accepted between ten to 15 packages containing cash from R.C. Additionally, R.C. initiated two wire transfers to co-defendant Adams' checking account. In total, R.C. sustained a loss of $280,000.00 [*Id*. at 50-52.]

**C. Other Victims of the Fraud**

To continue the fraud, the defendant and co-defendant Braimah would assume the identities of actual victims and create fake social media accounts, impersonating these victims, to appear legitimate to potential future victims. In total, this scheme involved at least 11 victims, some of whom are now deceased, and involved a loss amount of $2,180,923.00, with individual loss amounts of between $25,000 and $600,000. These actions caused a substantial financial hardship to at least five of the above listed victims [Doc. 75, Presentence Report, ¶¶ 53, 63].

## Guidelines

The parties entered a written plea agreement, dated May, 2024, with a stipulated advisory Guidelines range of 63 to 78 months based on a total offense level of 26 and Criminal

History Category of I [Doc. 59].

## 3553(a) Factors

In addition to the Guidelines range and the recommendations of the Sentencing Commission, the Court must also consider the Title 18, United States Code, Section 3553(a) factors. The factors in Title 18, United States Code, Section 3553(a) support a conclusion that a sentence at the high end of the defendant's Guidelines range is appropriate in this case.

As provided in Title 18, United States Code, Section 3553(a)(2), the Court shall consider the following factors: (1) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (2) the need for the sentence to afford adequate deterrence; (3) the need to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed educational or vocational training, medical care or other correctional treatment. A sentence towards the high end of the guidelines would be sufficient, but not greater than necessary to advance the goals set forth in 18 U.S.C. § 3553.

The offense in this case is serious. The scheme to defraud was organized and the defendant was by no means a minor participant. Rather, the defendant groomed his elderly victims over months by gaining their trust and earning their sympathy. He took advantage of them by reaching out over the Internet and to learn their vulnerabilities and exploit their desire for companionship.

This scheme robbed 11 elderly people of not only their life savings, but also their self-respect. Many are embarrassed at what happened to them and blame themselves. They feel guilty for being unable to provide an inheritance to their loved ones. None will live long

enough to fully be made whole. Some have lost their homes and must now rely upon others for support. These individuals are devastated.

The court should also consider the need for specific deterrence and to protect the public. While the defendant does not have a criminal history – suggesting he is not a high risk for re-offending – the conduct in this case, however, does show a level of sophistication that is noteworthy. It is unlikely the defendant would have independently stopped this scheme had he not traveled to the United States where he was apprehended.

Moreover, the need for general deterrence is critical here. The use of the Internet commit offenses, coupled with overseas criminals, is an increasing issue for law enforcement. The ease and anonymity of the Internet enables individuals, like the defendant, to commit offenses with a lesser risk of detection or capture. A sentence towards the high end of the guidelines in this case would go a long way to meeting that goal and provide for general deterrence. It would also protect the public from a defendant who demonstrated he had the manner, means and desire to commit this offense.

## Conclusion

For the reasons set forth above, the United States respectfully submits that a sentence at the high end of the advisory guidelines range is appropriate under the circumstances in this case and would be sufficient but not greater than necessary to accomplish the sentencing purposes embodied in Title 18, United States Code, Section 3553(a)(2). The United States reserves the right to offer argument and proof at the sentencing hearing as it deems appropriate and as the Court permits.

Respectfully submitted this the 24th day of October, 2024.

                                             FRANCIS M. HAMILTON III
                                             UNITED STATES ATTORNEY

By:    *s/ Suzanne H. Sullivan*
          Suzanne H. Sullivan
          Assistant United States Attorney
          800 Market Street, Suite 211
          Knoxville, Tennessee 37902
          (865) 545-4167
          suzanne.sullivan@usdoj.gov
          NY Bar # 3027208